# NO. 23-1588

In The

# United States Court Of Appeals
## For The Fourth Circuit

### KA'LAH MARTIN, a/k/a Kalah Martin,
*Plaintiff - Appellee,*

v.

### TRAVIS SHORT, both individually and in his official capacity as deputy with the Randolph County Sheriff's Department; KYLE GABBY, both individually and in his official capacity as deputy with the Randolph County Sheriff's Department; JEREMIAH HARRELSON, both individually and in his official capacity as deputy with the Randolph County Sheriff's Department,
*Defendants - Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
AT GREENSBORO

————————

### BRIEF OF APPELLANTS

————————

**Sean F. Perrin**
**Mike Ingersoll**
**WOMBLE BOND DICKINSON (US) LLP**
**301 S. College Street, Ste. 3500**
**Charlotte, North Carolina 28202**
**(704) 331-4992**

*Counsel for Appellants*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. _23-1588_     Caption: _Ka'Lah Martin v. Travis Short, Kyle Gabby, Jeremiah Harrelson_

Pursuant to FRAP 26.1 and Local Rule 26.1,

Travis Short
(name of party/amicus)

_____

 who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐YES ☑NO


2.    Does party/amicus have any parent corporations?    ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or
      other publicly held entity?    ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sean F. Perrin _____        Date: _____ 6/7/23 _____

Counsel for: Appellants _____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. 23-1588    Caption: Ka'Lah Martin v. Travis Short, Kyle Gabby, Jeremiah Harrelson

Pursuant to FRAP 26.1 and Local Rule 26.1,

Kyle Gabby
(name of party/amicus)


who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1. Is party/amicus a publicly held corporation or other publicly held entity? ☐YES ☑NO

2. Does party/amicus have any parent corporations? ☐YES ☑NO
   If yes, identify all parent corporations, including all generations of parent corporations:

3. Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity? ☐YES ☑NO
   If yes, identify all such owners:

12/01/2019 SCC    - 1 -

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES ☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES ☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sean F. Perrin _____          Date: _____ 6/7/23 _____

Counsel for: Appellants _____

Print to PDF for Filing

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.


No. _23-1588_     Caption: _Ka'Lah Martin v. Travis Short, Kyle Gabby, Jeremiah Harrelson_

Pursuant to FRAP 26.1 and Local Rule 26.1,

_Jeremiah Harrelson_
(name of party/amicus)

_____

who is _____Appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?     ☐YES ☑NO


2.    Does party/amicus have any parent corporations?     ☐YES ☑NO
      If yes, identify all parent corporations, including all generations of parent corporations:


3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?     ☐YES ☑NO
      If yes, identify all such owners:

4.  Is there any other publicly held corporation or other publicly held entity that has a direct
    financial interest in the outcome of the litigation?                    ☐YES☑NO
    If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)    ☐YES☑NO
    If yes, identify any publicly held member whose stock or equity value could be affected
    substantially by the outcome of the proceeding or whose claims the trade association is
    pursuing in a representative capacity, or state that there is no such member:

6.  Does this case arise out of a bankruptcy proceeding?                    ☐YES☑NO
    If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a
    party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the
    caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held
    corporation that owns 10% or more of the stock of the debtor.

7.  Is this a criminal case in which there was an organizational victim?    ☐YES☑NO
    If yes, the United States, absent good cause shown, must list (1) each organizational
    victim of the criminal activity and (2) if an organizational victim is a corporation, the
    parent corporation and any publicly held corporation that owns 10% or more of the stock
    of victim, to the extent that information can be obtained through due diligence.

Signature: /s/ Sean F. Perrin _____    Date: _____6/7/23_____

Counsel for: Appellants _____

- 2 -

Print to PDF for Filing

## **TABLE OF CONTENTS**

**Page:**

TABLE OF AUTHORITIES ................................................................. iii

STATEMENT OF SUBJECT MATTER JURISDICTION .....................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE...............................................................1

    STATEMENT OF THE FACTS ........................................................3

        I.    PLAINTIFF FAILS TO STOP FOR RANDOLPH COUNTY SHERIFF'S OFFICERS FOR ALMOST SIX MILES........................................................................3

        II.   PLAINTIFF DOES NOT IMMEDIATELY EXIT HER CAR AFTER SHE IS STOPPED .................................4

SUMMARY OF THE ARGUMENT ......................................................5

ARGUMENT ...........................................................................6

    APPLICABLE STANDARD OF REVIEW ..................................................6

    DISCUSSION.........................................................................6

        I.    DEFENDANTS DEPUTIES SHORT, GABBY, AND HARRELSON ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THEY DID NOT VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS WITH THEIR REASONABLE USE OF FORCE AND BECAUSE IT WAS NOT CLEARLY ESTABLISHED THAT THEY COULD NOT USE FORCE IN THE SITUATION THEY CONFRONTED.........................................6

            A.   PLAINTIFF CANNOT DEMONSTRATE THAT DEFENDANTS ACTED OBJECTIVELY UNREASONABLE .......................................................7

B.    IT WAS NOT CLEARLY ESTABLISHED THAT DEFENDANTS COULD NOT USE FORCE IN THE PARTICULAR SITUATION THEY ENCOUNTERED..........................................................20

II.    DEFENDANTS DEPUTIES ARE ENTITLED TO PUBLIC OFFICIAL IMMUNITY FOR THE PLAINTIFF'S CLAIMS UNDER STATE LAW. ...................25

CONCLUSION ........................................................................26

REQUEST FOR ORAL ARGUMENT ...................................26

CERTIFICATE OF COMPLIANCE ....................................27

# <u>TABLE OF AUTHORITIES</u>

**Page(s):**

**Cases:**

*Anderson v. Creighton*,
    483 U.S. 635, 107 S. Ct. 3034 (1987) ...........................................................22

*Ashcraft v. Al–Kidd*,
    563 U.S. 731, 131 S. Ct. 2074 (2011) ..................................................... 24-25

*Bailey v. Kennedy*,
    349 F.3d 731 (4th Cir. 2003) ...........................................................1

*Bell v. Dawson*,
    144 F. Supp. 2d. 454 (W.D.N.C. 2001)...........................................................26

*Biggs v. City of Maryland Heights*,
    2022 WL 1451670 (E.D. Mo. 2022) ......................................................11, 12

*City of Tahlequah v. Bond*,
    ––– U.S. –––, 142 S. Ct. 9 (2021) ................................................................21

*Cooper v. Sheehan*,
    735 F.3d 153 (4th Cir. 2013) ........................................................1, 6, 25

*Dalton v. Liles*,
    2021 WL 3493150 (W.D.N.C. 2021) ........................................................16

*District of Columbia v. Wesby*,
    583 U.S. 48, 138 S. Ct. 577 (2018) ...............................................................21

*Elliott v. Leavitt*,
    99 F.3d 640 (4th Cir. 1996) ......................................................8, 25

*Estate of Armstrong v. Village of Pinehurst*,
    810 F.3d 892 (4th Cir. 2016) ...........................................................9, 10, 14

*Foos v. City of Delaware*,
    492 F. App'x 582 (6th Cir. 2012)................................................................17

*Foote v. Dunagan*,
    33 F.3d 445 (4th Cir. 1994) ...........................................................12

*Givens v. Moore*,
    2022 WL 4100829 (W.D.N.C. 2022) ...........................................19

*Graham v. Connor*,
    490 U.S. 386, 109 S. Ct. 1865 (1989) ......................................*passim*

*Gwazdavskas v. Tharp*,
    2020 WL 3256824 (W.D. Va. 2020) ..............................................24

*Harlow v. Fitzgerald*,
    457 U.S. 800, 102 S. Ct. 2727 (1982) ......................................20, 21

*Harrell v. Purcell*,
    236 F. Supp. 2d 526 (M.D.N.C. 2002) ...........................................16

*Henry v. Purnell*,
    652 F.3d 524 (4th Cir. 2011) .............................................................7

*Hope v. Pelzer*,
    536 U.S. 730, 122 S. Ct. 2508 (2002) ............................................24

*Isenhour v. Hutto*,
    350 N.C. 601, 517 S.E.2d 121 (1999) ............................................25

*Jones v. Buchanan*,
    325 F.3d 520 (4th Cir. 2003) ..........................................................18

*Kingsley v. Hendrickson*,
    576 U.S. 389, 135 S. Ct. 2466 (2015) ...........................................9, 18

*Kisela v. Hughes*,
    —— U.S. ——, 138 S. Ct. 1148 (2018) .........................................21

*Mael v. Howard*,
    2022 WL 263235 (W.D.N.Y. 2022) ...............................................22

*Martin v. Gentile*,
    849 F.2d 863 (4th Cir. 1988) ..........................................................12

iv

*Mattos v. Agarano*,
   661 F.3d 433 (9th Cir. 2011) ........................................................17

*Messick v. Catawba County*,
   110 N.C. App. 707, 431 S.E.2d 489 (1993) ..................................25

*Michigan v. Long*,
   463 U.S. 1032, 103 S. Ct. 3469 (1983) ........................................11

*Milstead v. Kibler*,
   243 F.3d 157 (4th Cir. 2001) ..........................................................9

*Mullenix v. Luna*,
   577 U.S. 7, 136 S. Ct. 305 (2015) ................................................21

*Owens ex. rel. Owens v. Lott*,
   372 F.3d 267 (4th Cir. 2004) ........................................................22

*Pearson v. Callahan*,
   555 U.S. 194, 129 S. Ct. 808 (2009) ..............................................7

*Pegg v. Herrnberger*,
   845 F.3d 112 (4th Cir. 2017) ........................................................19

*Pennsylvania v. Mimms*,
   434 U.S. 106, 98 S. Ct. 330 (1977) ..............................................18

*Perry v. Greene County*,
   392 Fed. Appx. 761 (11th Cir. 2010) .......................................14-15

*Rogers v. Pendleton*,
   249 F.3d 279 (4th Cir. 2001) .....................................................6, 24

*Saucier v. Katz*,
   533 U.S. 194, 121 S. Ct. 2151 (2001) ........................................7, 20

*Scott v. Harris*,
   550 U.S. 372, 127 S. Ct. 1769 (2007) ............................................8

*Smith v. Ray*,
   781 F.3d 95 (4th Cir. 2015) .......................................................8, 18

*Swanson v. Powers*,
    937 F.2d 965 (4th Cir. 1991) ........................................................24

*Thomas v. Sellers*,
    142 N.C. App. 310, 542 S.E.2d 283 (2001) ................................25

*Torchinsky v. Siwinski,*
    942 F.2d 257 (4th Cir. 1991) ........................................................20

*United States v. Buzzard*,
    1 F.4th 198 (4th Cir. 2021) ...........................................................22

*United States v. Miller*,
    2019 WL 4254910 (N.D. W. Va. 2019) .......................................12

*United States v. Norton*,
    No. 2:19-CR-145, 2021 WL 769329 (E.D. Tenn. Feb. 18, 2021),
    *report and recommendation adopted*,
       No. 2:19-CR-145, 2021 WL 744403 (E.D. Tenn. Feb. 25, 2021) ..........17

*United States v. Robinson*,
    846 F.3d 694 (4th Cir. 2017) ........................................................11

*United States v. Soriano-Jarquin*,
    492 F.3d 495 (4th Cir. 2007) ........................................................14

*Unus v. Kane*,
    565 F.3d 103 (4th Cir. 2009) ........................................................14

*Waterman v. Batton*,
    393 F.3d 471 (4th Cir. 2005) ..........................................................8

*Wertish v. Krueger*,
    433 F.3d 1062 (8th Cir. 2006) .............................................. 23, 24

*White v. Pauly*,
    580 U.S. 73, 137 S. Ct. 548 (2017) ..............................................24

*Wilkins v. Gaddy*,
    559 U.S. 34, 130 S. Ct. 1175 (2010) ............................................18

*Wilson v. Flynn*,
    429 F.3d 465 (4th Cir. 2005) ...........................................................19

*Wilson v. Layne*,
    141 F.3d 111 (4th Cir. 1998) ......................................................21

**Statutes:**

28 U.S.C. § 1291 ...........................................................................1

42 U.S.C. § 1983 ..................................................... *passim*

N.C.G.S. § 20-141.5 ................................................... 10, 12

**Constitutional Provisions:**

U.S. Const. amend. IV ................................................ *passim*

## STATEMENT OF SUBJECT MATTER JURISDICTION

This Court has jurisdiction over this appeal by defendants Randolph County deputy sheriffs Travis Short, Kyle Gabby, and Jeremiah Harrelson in their individual capacities under 28 U.S.C. § 1291 because the trial court's order, which denied their motion for summary judgment asserting entitlement to qualified immunity under federal law and public official immunity under state law, is immediately appealable. *Bailey v. Kennedy*, 349 F.3d 731, 738-39 (4th Cir. 2003) (allowing review under both immunity doctrines); *Cooper v. Sheehan*, 735 F.3d 153, 157 (4th Cir. 2013) (same).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

Whether Travis Short, Kyle Gabby, and Jeremiah Harrelson are entitled to summary judgment in their individual capacity on the basis of (1) qualified immunity on Plaintiff's claim for excessive force in violation of the Fourth Amendment of the United States Constitution under 42 U.S.C. § 1983 and (2) public official immunity on Plaintiff's claims for assault and battery under North Carolina law.

## STATEMENT OF THE CASE

This case was filed in the United States District Court for the Middle District of North Carolina on November 23, 2021 by Plaintiff Ka'lah Martin against Randolph County Sheriff Gregory Seabolt, and Randolph County Sheriff's Office deputies Steven Myers, Edward Slafky, Travis Short, Kyle Gabby, Travis Cox, Jeremiah Harrelson, Eric Weaver, Steve Shawver, Sr., and two John Doe defendants. (JA10-63)  Plaintiff asserted claims under 42 U.S.C. § 1983 for unreasonable search

1

and seizure, excessive force, deliberate indifference to medical needs, failure to train, failure to intervene, and state tort claims of assault and battery, gross negligence, and civil conspiracy. *Id*.

The Parties consented to Magistrate Judge jurisdiction, and Defendants filed an answer on February 1, 2022. (JA64-96)  Plaintiff filed a First Amended Complaint on June 16, 2022, and the Magistrate Judge ordered that Defendants' answer to the Complaint applied to the First Amended Complaint. (JA97-157, JA159)  Plaintiff filed a notice of voluntary dismissal of all claims against Eric Weaver on July 28, 2022. (JA160-164, JA166)

On October 11, 2022, Defendants moved for summary judgment on all claims and asserted various defenses, including qualified immunity under federal law and public official immunity under state law for the individual-capacity claims against them. (JA167-194)

On April 25, 2023, the Magistrate Judge issued an opinion granting the motion in part and denying it in part. (JA557-624)  The Court granted the motion as to all claims except the individual-capacity claims against Deputies Short, Gabby, and Harrelson for excessive force under federal law, assault and battery under state law, and Plaintiff's prayer for punitive damages. *Id*. All other claims and Defendants were dismissed. *Id*. Defendants timely filed a Notice of Appeal on May 24, 2023. (JA625-626)

## STATEMENT OF THE FACTS

### I.  PLAINTIFF FAILS TO STOP FOR RANDOLPH COUNTY SHERIFF'S OFFICERS FOR ALMOST SIX MILES

On February 28, 2019, Plaintiff was stopped by two separate law enforcement agencies. (JA112)  The first stop was by the Montgomery County Sheriff's Office who seized Plaintiff's tags for driving without insurance.  *Id*.  Despite having her tags seized, Plaintiff continued to drive.  *Id*.

Later that day, at approximately 6:38 p.m on February 28, 2019, Defendant Short observed Plaintiff driving on Interstate 73 without tags.  (JA112)  Short activated his emergency lights and attempted to pull Plaintiff over.  *Id*.  Plaintiff did not immediately pull over due to construction on the shoulder of the highway. (JA581)  The speed limit on Interstate 73 was 70 miles-per-hour.  (JA113)  After seeing Short, Plaintiff slowed her vehicle to 30 mph and turned on her hazard lights. (JA114)  Plaintiff drove past two highway exits, and continued driving on Highway 73.  (JA561)

Since Plaintiff did not stop, Short radioed to other officers "that he was pursuing a vehicle."  (JA145)  As a result of Short's call, Randolph County Sheriff's Office deputies Kyle Gabby, Eric Weaver, Jeremiah Harrelson, Travis Cox, and Edward Slafky responded to the scene by positioning their vehicles at the next exit on the highway, the McDowell St. exit.  (JA144-150)  Plaintiff eventually exited Interstate 73 and pulled off the McDowell St. exit.  (JA150)  The distance from when

3

Short initiated his emergency lights until Plaintiff pulled over on McDowell St. was 5. 7 miles. (JA153)

## II.  PLAINTIFF DOES NOT IMMEDIATELY EXIT HER CAR AFTER SHE IS STOPPED

Once Plaintiff finally stopped her vehicle, Short, Weaver, Gabby, and Harrelson approached her car with their guns drawn. (JA144-150)  Short, Weaver, and Gabby approached the driver side door, while Harrelson approached the front passenger door. *Id*.  Short, Weaver, and Gabby ordered Plaintiff to show her hands and exit the car, but Plaintiff did not exit her car. *Id*.  Plaintiff replied that she could not open the driver side door or roll her windows down. (JA562)  Unbeknownst to Defendants, Plaintiff's car, a Toyota Sedan, was a self-described "hooptie." (JA204).  At the time of the stop, the front windows and doors on Plaintiff's vehicle were broken and inoperable, and the vehicle was only accessible from the rear door. (JA150.)  To operate her car, Plaintiff had to enter through the right rear passenger door, then climb between the two front seats into the driver seat. (JA559)

Short gave Plaintiff commands to keep her hands on the steering wheel, and exit her car. (JA562). Harrelson heard Plaintiff tell Short that she could not open the car door. (JA562-563)

Short and Weaver unsuccessfully tried to open the Plaintiff's driver side door, and Short and Weaver broke the driver's side door. (JA146)  After the driver's side door was broken, Harrelson took his baton and broke the passenger side window. *Id*.

Short and Weaver then pulled Plaintiff out of the car through the broken side window with Gabby's assistance. (JA144-145)    Short, Gabby, and Harrelson then placed Plaintiff on the ground to effect the arrest. (JA564). Deputies Weaver and Slafky arrived at the scene after Plaintiff's arrest. *Id.*

Short took Plaintiff to the Randolph County jail where she was charged with 1) fleeing to elude arrest; 2) operating a vehicle with no insurance; and 3) failing to display a registration plate. (JA151-152) These charges were later dismissed by state prosecutors. (JA565)

Plaintiff did not request any medical attention in Jail. (JA565) After bonding out, she went to the hospital on March 4, 2019. *Id.* She received a band-aid for her knee, and Ibuprofen and muscle relaxers. *Id.* X-rays indicated no fracture or structural damage to her knee. (JA252-256).

## SUMMARY OF THE ARGUMENT

Defendants Short, Gabby, and Harrelson are entitled to qualified immunity because their use of force was reasonable- given that they were confronted with a situation where Plaintiff 1) was driving a car without a license plate on an Interstate on a dark and rainy evening; 2) refused to stop for almost six miles; 3) was driving forty miles below the speed limit; 4) passed two exits where she could have gotten off the Interstate; and 5) after finally stopping, did not get out of her car or open her

windows- and also because it was not clearly established at the time that reasonable officers in such circumstances could not use force.

Defendants are also entitled to public official immunity on the assault and battery claim against them. As "analysis of public officers' immunity is functionally identical to" that of "qualified immunity with respect to . . . § 1983 claims," this Court may analyze both the federal and state-law claims in the same way. *Cooper v. Sheehan*, 735 F.3d 153, 160 (4th Cir. 2013).

## ARGUMENT

### APPLICABLE STANDARD OF REVIEW

The standard of appellate review is de novo. *Rogers v. Pendleton*, 249 F.3d 279, 285 (4th Cir. 2001).

### DISCUSSION

**I. DEFENDANTS DEPUTIES SHORT, GABBY, AND HARRELSON ARE ENTITLED TO QUALIFIED IMMUNITY BECAUSE THEY DID NOT VIOLATE PLAINTIFF'S CONSTITUTIONAL RIGHTS WITH THEIR REASONABLE USE OF FORCE AND BECAUSE IT WAS NOT CLEARLY ESTABLISHED THAT THEY COULD NOT USE FORCE IN THE SITUATION THEY CONFRONTED**

None of the Defendants violated Ka'lah Martin's Fourth Amendment rights because their use of force was reasonable. They are therefore entitled to qualified immunity because (1) they did not commit a constitutional violation by their reasonable use of force and (2) it was not clearly established at the time that they could not use force against an individual who was driving a car without a license

plate on an Interstate on a dark and rainy evening, refuses to stop for almost six miles, passes two exits where she could have gotten off the Interstate, and refuses (or cannot) get out of her car or open her windows.

### A.    PLAINTIFF CANNOT DEMONSTRATE THAT DEFENDANTS ACTED OBJECTIVELY UNREASONABLE

Qualified immunity protects officers who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful. *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (en banc) (internal citations omitted).  A Court reviewing qualified immunity first considers whether "the officer's conduct violated a constitutional right." *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001).  If there has been no constitutional violation, the officer is entitled to qualified immunity.  *Id.*  If the facts could establish a constitutional violation, the Court must analyze whether the constitutional right alleged to have been violated was "clearly established" at the time of the officer's actions.  *Id.*[1]

To prevail on her excessive force claim, Plaintiff must establish that the force applied by Defendants was objectively unreasonable.  *Graham v. Connor*, 490 U.S. 386, 397, 109 S. Ct. 1865, 1872 (1989).  The *Graham* inquiry focuses on "whether

---

[1] In *Pearson v. Callahan*, 555 U.S. 194, 236, 129 S. Ct. 808, 817-18 (2009), the Supreme Court granted courts discretion over the order of application of the *Saucier* analysis, while recognizing that conducting the analysis in order is often beneficial.

a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (internal citations omitted). While the trial court found three distinct uses of force: 1) during the approach to the car when guns were drawn; 2) breaking the windows of Plaintiff's car; and 3) pulling her from the car through the broken window. (JA582-583), this Court has held that in determining whether the force used was reasonable, "we must 'view it in full context, with an eye toward the proportionality of the force in light of all the circumstances. Artificial divisions in the sequence of events do not aid a court's evaluation of objective reasonableness.'" *Smith v. Ray*, 781 F.3d 95, 101 (4th Cir. 2015) (*citing Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005)). Therefore, in assessing whether an officer's use of force was objectively reasonable, a court should view the force "in full context, with an eye towards proportionality of the force in light of all the circumstances." *Smith*, 781 at 101 (4th Cir. 2015) (internal citations omitted). When considering an excessive force claim, the court "must balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Scott v. Harris*, 550 U.S. 372, 383, 127 S. Ct. 1769, 1778 (2007).

This Court makes the objective reasonableness determination "from the perspective of a reasonable officer on the scene, including what the officer knew at

the time, not with the 20/20 vision of hindsight." *Kingsley v. Hendrickson*, 576 U.S. 389, 397, 135 S. Ct. 2466, 2473 (2015) (internal citations omitted). The relevant facts and circumstances include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting seizure or attempting to evade seizure by flight." *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872. If the Graham factors weigh in favor of the officer, they are deemed to have acted objectively reasonable in light of the circumstances. *Estate of Armstrong v. Village of Pinehurst*, 810 F.3d 892, 906 (4th Cir. 2016).

Courts must not engage in "the 20/20 vision of hindsight'" in evaluating the use of force and reasonableness must be judged from the perspective of a reasonable officer at the scene. *Graham*, 490 U.S. at 396, 109 S. Ct. at 1872. "Thus, the objective facts 'must be filtered through the lens of the officer's perceptions at the time of the incident in question.'" *Milstead v. Kibler*, 243 F.3d 157 (4th Cir. 2001) (citation omitted). Courts must consider that officers "are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving[,]" and must "avoid judging the officers' conduct with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 397, 109 S. Ct. at 1872 (internal quotation marks omitted). Against this backdrop, it is clear that the trial court erred in finding that

there was a genuine issue of fact as to whether Defendants' conduct was objectively reasonable.

The trial court erred in finding that the first Graham factor, the severity of the underlying offense, did not weigh in favor of either party. (JA583-585). At the time of the stop, Defendants believed that Plaintiff was committing speeding to elude, a felony- assuming aggravating factors- under North Carolina law. N.C.G.S. § 20-141.5(b). While the trial court correctly noted that the first factor turns on the severity of the crime, not its classification, *see Estate of Armstrong*, 810 F.3d at 900 (recognizing that the first *Graham* factor is intended "as a proxy for determining whether 'an officer [had] any reason to believe that [the subject of a seizure] was a potentially dangerous individual,'"), the trial court erred when it found that this factor did not favor either side.    Although Plaintiff's fleeing was done at a low speed with her hazard lights on, the trial court ignored the fact that at the time force was used, Defendants knew the following about Plaintiff: 1) she was driving a car with no registration plate; 2) she drove 5.7 miles before stopping; 3) she passed two exits on Interstate 73 while Short's emergency lights were activated; and 4) she was driving forty miles below the speed limit.    (JA581)    Given these facts, it was not unreasonable for Defendants to believe that Plaintiff was a potentially dangerous individual.

10

First, as this Court has previously stated, "[T]raffic stops . . . are inherently dangerous for police officers." *United States v. Robinson*, 846 F.3d 694, 698 (4th Cir. 2017); *accord Michigan v. Long*, 463 U.S. 1032, 1049, 103 S. Ct. 3469, 3481 (1983) ("[R]oadside encounters between police and suspects are particularly hazardous."). The inherent dangerousness of the stop was exacerbated by the facts that 1) the stop was done in a dark area, with pouring rain. (JA561); and 2) that Plaintiff passed two exits before stopping. (JA581). While understandable that Plaintiff did not pull over due to construction impeding the highway shoulder (JA581), she had two other opportunities to exit the Highway and did not pull over either time.

The fact that Plaintiff slowed down during the 5.7 miles she refused to pull over does not eliminate any perceived danger. The situation confronting these Defendants is similar to *Biggs v. City of Maryland Heights* in which a driver slowed down but continued driving for a quarter mile after a marked patrol car initiated its lights and sirens. 2022 WL 1451670 at *1 (E.D. Mo. 2022) (unpublished). The driver later explained that "he wanted to find a well-lit spot to pull over." *Id*. at 2. Once the vehicle stopped, the officer pointed his firearm at the driver. *Id*. The court determined that since the officer did not know that the driver was merely waiting for a well-lit spot to pull over, it was reasonable for him to believe that the driver was fleeing and might have been dangerous. *Id*. at *7. Thus, it was reasonable for the

11

officer to point his firearm at the driver "until he was certain the situation was under control and his safety was not threatened." *Id*.   This Court has also expressly recognized the deterrent value of displaying a pointed firearm when approaching a potentially dangerous suspect seated in a vehicle. *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988) ("a strong show of force, coupled with the threat to actually use it if necessary, is sometimes the safest way to ensure that a potentially volatile situation does not erupt into physical violence").

The same is true here. While the trial court faulted Defendants for approaching Plaintiff's car with their firearms, Defendants had reason to believe that Plaintiff had committed the felony of eluding police.   Two aggravating factors supporting the enhancement of N.C.G.S. § 20-141.5 to a felony are gross impairment and driving with a revoked license.   N.C.G.S. §§ (b)(2), (5).   Plaintiff's erratic driving could certainly lead Defendants to believe that she met one of those requirements- gross impairment.   Under the situation they confronted upon stopping Plaintiff, Defendants had a right to display firearms during what they reasonably perceived as a felony stop.   *Foote v. Dunagan*, 33 F.3d 445, 448-449 (4th Cir. 1994) (collecting cases where it was reasonable for an officer to draw his weapon during a traffic stop); *see also United States v. Miller*, 2019 WL 4254910 at *6 (N.D. W. Va. 2019) (unpublished) (court finds that a driver being slow to pull over and passing multiple well-lit areas was a reasonable cause for concern that could extend a traffic stop

12

because drivers may be slow to pull over, as it gives them an opportunity to hide evidence or line up their stories.)

The trial court also erred in finding that the second factor, whether the "suspect poses an immediate threat to the safety of the officers or others," did not weigh in favor of either party. (JA585-589) In assessing this factor, the trial court found there were issues of fact regarding 1) whether Plaintiff kept her hands in view of Defendants at all times; 2) she did not engage in a high-speed chase; 3) there was no suggestion that Plaintiff had weapons; 4) she was not belligerent; 5) she could not roll her windows down or else disobeyed Defendants' orders; and 6) she informed Defendants that she could not open her front doors or windows. *Id*. Even under the trial court's version of what the facts could show, this factor favors Defendants.

There is no evidence in the record that Defendants knew that Plaintiff was unable to open her doors and windows because her car was a "hooptie." In fact, when asked "And they [Defendants] would not have known then that your car can only be opened through the passenger side?", she replied, "Yeah. They wouldn't have known that." (JA204) The only thing that Defendants knew when they approached is that the same driver who led them on a 5.7 mile chase was now telling them that she could not open the doors and windows for some unknown reason.

13

Were Defendants supposed to remain at the scene forever until they could figure out how to open Plaintiff's car? Of course not.

In assessing this factor, the trial court also erred when it found that "Plaintiff did not actually **refuse** to comply with Defendants' orders." (JA587) (emphasis in original) In fact, she did. While she had an excuse- her car was a hooptie- Defendants had no reason to know whether that was true. (JA204) All they knew when they approached the car and asked her to open it, was that she did not do what they asked. The trial court also ignored that when Defendants approached her car, it was raining, dark, and visibility was low, providing additional reason for not accepting Plaintiff's words at face value that she could not open her car or windows. When police lawfully order a driver to exit his vehicle and the driver refuses, police may use reasonable force to remove the driver. *See, e.g., Estate of Armstrong*, 810 F.3d at 901 ("Noncompliance with lawful orders justifies some use of force, but the level of justified force varies based on the risks posed by the resistance.").

Officers performing a lawful stop are entitled to take reasonable steps to protect their personal safety. *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007) (internal citations omitted). *See also Unus v. Kane*, 565 F.3d 103, 118 (4th Cir. 2009) (explaining that under particular circumstances, "officers were reasonably entitled to believe that the drawing of weapons was necessary in order to gain control of a fluid situation and ensure the safety of all involved"); *Perry v.*

14

*Greene County*, 392 Fed. Appx. 761, 763 (11th Cir. 2010) (affirming summary judgment for officers who "drew their service weapons and pointed them in Perry's direction as they approached her vehicle" at conclusion of pursuit for minor traffic violations "[b]ecause neither officer knew the reason for Perry's failure to pull over").

The trial court also erred in finding that the third factor, whether Plaintiff was "actively resisting arrest or attempting to evade arrest by flight", did not weigh in favor of either party. (JA589-593) For this factor, the trial court ignored the most significant evidence of flight: Plaintiff drove 5.7 miles and passed two exits before she pulled over. Again, while the trial court found that Defendants heard Plaintiff say she could not open her doors and window, they didn't know why. Was it because Plaintiff was refusing to do so? Was it because she couldn't? None of the officers knew that Plaintiff was driving a car with only one operable rear door. All they knew was that Plaintiff was not complying with their orders. Given what they did and did not know, it was reasonable for the officers to interpret Plaintiff's conduct as refusing commands. Indeed, if as Plaintiff acknowledges, she could not open the door, how were Defendants supposed to get her out of the car other than by forcible means?

Importantly, "[t]he court is not responsible for taking a 'second look' at alternative methods of force the police officer might have utilized. Rather, the

15

court's focus must be on 'the circumstances as they existed at the moment force was used.'" *Harrell v. Purcell*, 236 F. Supp. 2d 526, 532 (M.D.N.C. 2002) (internal citations and quotations omitted).  A federal district court in this Circuit has addressed similar, though not exact, circumstances.  In *Dalton v. Liles*, 2021 WL 3493150 (W.D.N.C. 2021) (unpublished), the U.S. District Court for the Western District of North Carolina found no excessive force where the plaintiff was involved in a vehicle chase, forced officers to set up a barricade to effectuate the stop, who approached with weapons drawn upon that stop, and broke a window to extract a driver when commands were not followed.  Further, unlike the instant case, several blows were administered to the plaintiff to subdue the plaintiff following unsuccessful use of a taser.  However, like this case, "[a]s soon as the objectives of control and officer safety were satisfied, [the officers] ceased any further application of force."  2021 WL 3493150 at *4.

Albeit in a criminal matter, the U.S. District Court for the Eastern District of Tennessee also addressed similar facts in connection with allegations of excessive force.  As the court observed:

> Deputy Giles ordered Defendant out of the vehicle multiple times, but Defendant refused to comply, ultimately telling the officer that something was wrong with the door and it would not open. Deputy Giles initially had his gun drawn but placed it back in his holster and approached the vehicle with a baton. Deputy Giles broke the passenger's window with his baton in order to extract Defendant from the vehicle. Given the circumstances, Defendant was then handcuffed and detained for the safety of responding officers. . . .

16

In balancing Defendant's interest versus officer safety in the instant action, the Court cannot overlook the fact that officers were led on a five-mile pursuit[.]  . . . Officers witnessed the pickup truck break multiple traffic laws.  Once the truck was stopped, Defendant refused to comply with police commands to exit the vehicle.  When Deputy Giles tried to open his door, the door was locked. . . . [T]here was no way for officers to know at that moment in time to what extent Defendant was involved in the decision to flee officers nor what danger he might pose to their safety. These facts, when taken together, justify Deputy Giles' actions in extracting Defendant through the pickup truck's window.

*United States v. Norton*, No. 2:19-CR-145, 2021 WL 769329, at *2-4 (E.D.

Tenn. Feb. 18, 2021), *report and recommendation adopted*, No. 2:19-CR-145, 2021

WL 744403 (E.D. Tenn. Feb. 25, 2021).

As the Ninth Circuit recognized:

There are only so many ways that a person can be extracted from a vehicle against her will, and none of them is pretty.  Fists, batons, choke holds, dogs, tear gas, and chemical spray all carry their own risks to suspects and officers alike.  We see plenty of cases where someone on the business end of these techniques suffers serious injuries, not to mention injuries sustained by police officers who engage in hand-to-hand combat with recalcitrant individuals.

*Mattos v. Agarano*, 661 F.3d 433, 459 (9th Cir. 2011) (Silverman, J. concurring in

part and dissenting in part) (en banc); *Foos v. City of Delaware*, 492 F. App'x 582,

584 (6th Cir. 2012) (same).

Even accepting her version of the facts, under the totality of circumstances,

the officers' decision to remove her from the vehicle was objectively reasonable in

light of the threats posed by her non-compliance—threats exacerbated by the night,

17

rain, and the officers' reasonable perception of her conduct leading up to and during the stop. *See, e.g., Pennsylvania v. Mimms*, 434 U.S. 106, 110-11, 98 S. Ct. 330 (1977) (per curiam) (police may order driver out of vehicle during traffic stop to protect officer safety).

Assessment of the *Graham* factors demonstrates that Defendants' limited use of force was reasonable. The *Graham* factors, however, are not exhaustive. *Kingsley*, 576 U.S. at 397, 135 S. Ct. at 2473. Ultimately, the Court looks at the use of force with "an eye towards proportionality of the force in light of all the circumstances." *Smith*, 781 F.3d at 101-102. Defendants' use of force was proportional to the situation Defendants confronted for several reasons. First, Plaintiff incurred very little injuries which the trial court ignored.[2] She did not seek any medical attention at the Jail, received a band-aid and Ibuprofen and muscle relaxers several days later, and x-rays revealed no other injuries. (JA252-256, JA565) While the Supreme Court has rejection the notion that there is a de-minimus injury exception to excessive force cases, it may demonstrate the amount of force used. *Wilkins v. Gaddy*, 559 U.S. 34, 37-40, 130 S. Ct. 1175, 1178-1180 (2010). *See also Jones v. Buchanan*, 325 F.3d 520, 531 (4th Cir. 2003) (extent of injury may be "another consideration in determining whether force was excessive."). As this Court

---

[2]     The trial court discussed Plaintiff's injuries in relation to the deliberate indifference claim, not the excessive force claim. (JA604-605)

stated, "[a]n efficient, lawful arrest of a resisting suspect that causes the suspect to suffer only de minimis injuries does not constitute excessive force." *Pegg v. Herrnberger*, 845 F.3d 112, 120 (4th Cir. 2017). *See also Givens v. Moore*, 2022 WL 4100829, at *7-8 (W.D.N.C. 2022) (considering allegations of severe damages against medical conclusions of minimal injury in granting summary judgment in vehicle extraction case, and holding "[t]he Plaintiff's contentions that the Defendants used excessive force and/or failed to intervene are 'so utterly discredited by the record that no reasonable jury could have believed him.'") (internal citations omitted).

Second, there is no evidence in the record that  Defendants made any derogatory or disparaging comments to Plaintiff after taking her out of her car. In addition, Plaintiff was also not subjected to any other uses of force after she was handcuffed.  Both of these facts weigh towards the reasonableness of the force.  *See Wilson v. Flynn*, 429 F.3d 465, 468-469 (4th Cir. 2005) (in analysis under *Graham v. Conner*, this Court "find[s] it significant that [plaintiff] admits that the allegedly excessive force ceased after the officers handcuffed him.").

Third, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*, 490 U.S. at  396-97, 109

S. Ct. at 1872.   When the use of force was used, Defendants were faced with a split second decision to use force on Plaintiff who 1) refused to pull over for almost six miles; 2) was driving a car with no plate on an Interstate; 3) refused – for some reason- to open the door; and 4) refused- for some reason- to get out of the car. Defendants' use of force was objectively reasonable under the situation they encountered on February 28, 2019.   Thus, Plaintiff's excessive force claim therefore fails as a matter of law.

**B.     IT WAS NOT CLEARLY ESTABLISHED THAT DEFENDANTS COULD NOT USE FORCE IN THE PARTICULAR SITUATION THEY ENCOUNTERED**

Even if Plaintiff has demonstrated that her constitutional rights were violated, Defendants are protected by qualified immunity since they did not violate Plaintiff's clearly established rights.  *Torchinsky v. Siwinski,* 942 F.2d 257, 261 (4th Cir. 1991). Qualified immunity shields "government officials performing discretionary functions…from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

The inquiry into whether a right is clearly established must "be undertaken in light of the specific context of the case" and "not as a broad general proposition. . . ." *Saucier, supra*.  This inquiry is limited to the law at the time of the incident, as "an

official could not be reasonably expected to anticipate subsequent legal developments." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The Supreme Court has "repeatedly told courts not to define clearly established law at too high a level of generality." *City of Tahlequah v. Bond*, ——— U.S. ———, 142 S. Ct. 9, 11 (2021). Instead, the "rule's contours must be so well defined that it is 'clear to a reasonable officer that his conduct was unlawful in the situation [they] confronted.'" *District of Columbia v. Wesby*, 583 U.S. 48, 63, 138 S. Ct. 577, 590 (2018) (internal citations omitted). "Such specificity is especially important in the Fourth Amendment context," where it is "sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Mullenix v. Luna*, 577 U.S. 7, 12, 136 S. Ct. 305, 308 (2015) (per curiam) (citation omitted). "Precedent involving similar facts can help move a case beyond the otherwise hazy border between excessive and acceptable force and thereby provide an officer notice that a specific use of force is unlawful." *Kisela v. Hughes*, ——— U.S. ———, 138 S. Ct. 1148, 1153 (2018) (per curiam) (internal quotation marks and citation omitted).

The law is "clearly established" for qualified immunity purposes by decisions of the U.S. Supreme Court, Fourth Circuit Court of Appeals, or the highest court of the state where the case arose. *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998) (en banc). A right may also be clearly established based on a "'consensus of cases

of persuasive authority' from other jurisdictions." *Owens ex. rel. Owens v. Lott*, 372 F.3d 267, 280 (4th Cir. 2004) (internal citations omitted). As demonstrated below, no case in this Circuit or persuasive authority from other circuits provided Defendants with notice that they crossed a bright line. That is the very essence of qualified immunity- officers cannot be held liable for making bad guesses, but only for "transgressing bright lines." *Anderson v. Creighton*, 483 U.S. 635, 639-640, 107 S. Ct. 3034, 3039 (1987).

Plaintiff had several opportunities to pull over, was given commands with which to comply, and was told to exit the vehicle—but did not. "[G]iven the importance of officer safety and the Supreme Court's repeated recognition that '[t]raffic stops are "especially fraught with danger to police officers,"'" *United States v. Buzzard*, 1 F.4th 198, 204 (4th Cir. 2021) (quotations omitted), removing Plaintiff from the vehicle was justified. Other courts agree. *See, e.g., Mael v. Howard*, 2022 WL 263235, at *6 (W.D.N.Y. 2022) (unpublished) (extraction and take-down maneuver reasonable where plaintiff "refused . . . verbal demands to exit the vehicle, rolled up the car window, tried to close the car door, and clung onto the steering wheel while [the officer] attempted to extract her from the vehicle").

Nothing in the trial court's analysis changes this. The trial court did not identify any cases from this Circuit or a consensus of authority that Defendants crossed a bright line, but only cases from the Fifth, Ninth, and Tenth Circuits, as

well as unpublished cases from district courts in other circuits, (JA594-596). In fact, other cases demonstrate that there is no consensus of authority. For instance, in *Wertish v. Krueger*, 433 F.3d 1062 (8th Cir. 2006), the Eighth Circuit considered a similar issue. In that case, the plaintiff, a Type 1 diabetic, was experiencing the effects of low blood sugar and was driving erratically. *Id*. at 1064-65. The defendant officer, Krueger, activated his emergency lights and siren to initiate a traffic stop, but the plaintiff did not stop. *Id*. Krueger then asked for backup to lay "stop sticks" across the road and the plaintiff stopped, at which time the defendant officers approached the vehicle with their weapons drawn and ordered the plaintiff out of the car. *Id*. When the plaintiff did not exit the car, an officer grabbed him, pulled him out of the vehicle, pushed him to the ground, handcuffed him, and placed him in the officer's vehicle. *Id*. Officers then learned of Wertish's medical condition, and no charges were filed. *Id*. Wertish sued the officers for excessive force, and the Eighth Circuit concluded that the officer's actions were not unreasonable. *Id*. at 1065-66. The Court focused on what the officers knew at the time, which is that the plaintiff was driving erratically and ignoring commands to pull over, and concluded that the officers had probable cause to pull over the vehicle, and that the plaintiff's passive resistance reasonably required "somewhat more force," and concluded that the officers were entitled to qualified immunity. *Id*. at 1066-67. When Wertish finally stopped but failed to comply with orders to get out of his vehicle, it was objectively

23

reasonable for Krueger to pull Wertish from the truck and handcuff him. *Id.*  See also *Gwazdavskas v. Tharp*, 2020 WL 3256824 at ** 2, 7 (W.D. Va. 2020) (granting an officer's motion to dismiss an excessive force claim when the officer shattered a driver's window who was refusing to exit his vehicle).

For qualified immunity, "the requirement . . . is that the law be <u>clearly</u> established, not simply possibly established or even probably established." *Swanson v. Powers*, 937 F.2d 965, 968 (4th Cir. 1991) (emphasis added).  Further, "the 'contours of the right' must have been so conclusively drawn as to leave no doubt that the challenged action was unconstitutional." *Id.* at 969.  Consequently, "in gray areas, where the law is unsettled or murky, qualified immunity affords protection to an officer who takes an action that is <u>not</u> <u>clearly</u> <u>forbidden</u> – even if the action is later deemed wrongful." *Rogers v. Pendleton*, 249 F.3d at 286 (4th Cir. 2001) (emphasis added).  The "clearly established" standard requires that the legal principles are sufficiently clear that a reasonable official would understand that what he is doing violates that right. *Hope v. Pelzer*, 536 U.S. 730, 739, 122 S. Ct. 2508, 2516 (2002).    Thus, courts have stressed the need to "identify a case where an officer acting under similar circumstances ... was held to have violated the Fourth Amendment." *White v. Pauly*, 580 U.S. 73,  137 S. Ct. 548, 5552 (2017) (per curiam). Existing precedent must place the lawfulness of the officers' conduct "beyond debate." *Ashcraft v. Al–Kidd*,  563 U.S. 731, 741, 131 S. Ct. 2074, 2083

(2011).   At the time officers 1) approached Plaintiff's car with guns; 2) broke her windows; and 3) took her out of the car, they did not violate any clearly established rights.   *See Elliott*, 99 F.3d at 642 ("[t]he court's focus should be on the circumstances at the moment force was used and on the fact that officers on the beat are not often afforded the luxury of armchair reflection.").

## II.   DEFENDANT DEPUTIES ARE ENTITLED TO PUBLIC OFFICIAL IMMUNITY FOR THE PLAINTIFF'S CLAIMS UNDER STATE LAW.

Defendants are entitled to public official immunity for the plaintiff's state-law claims because their actions were not malicious, corrupt, or outside the scope of their duties.   A law enforcement officer, such as a deputy sheriff, is a public official. *Messick v. Catawba County*, 110 N.C. App. 707, 718, 431 S.E.2d 489, 496 (1993). Under public official immunity, public officers engaged in the performance of their duties may not be held liable for negligence.   *Isenhour v. Hutto*, 350 N.C. 601, 609, 517 S.E.2d 121, 127 (1999).   A public official may be held liable in his individual capacity only if his "conduct is malicious, corrupt, or outside the scope of his official authority."   *Thomas v. Sellers*, 142 N.C. App. 310, 313, 542 S.E.2d 283, 286 (2001).

Plaintiff's state-law claims are analyzed in a manner similar to the claims under federal law because "analysis of public officers' immunity is functionally identical to" that of "qualified immunity with respect to . . . § 1983 claims."   *Cooper v. Sheehan, supra*, 735 F.3d at 160.   As Defendants are entitled to qualified immunity on the federal excessive force claim, they are entitled to judgment as a matter of law

on the state assault and battery claim on the basis of public official immunity. *Bell v. Dawson*, 144 F. Supp. 2d. 454, 464 (W.D.N.C. 2001).

## CONCLUSION

Based on the foregoing arguments and authorities, Defendants- Appellants Travis Short, Kyle Gabby, and Jeremiah Harrelson respectfully submit that the order of the trial Court denying their motion for summary judgment on the individual capacity section 1983 excessive force claims against them, and the assault and battery claim against them should be reversed.

## REQUEST FOR ORAL ARGUMENT

Counsel for the Defendants-Appellants desires oral argument.

Respectfully submitted this 6th day of September, 2023.

/s/ Sean F. Perrin
/s/ Mike Ingersoll
Sean Perrin, NCSB No. 22253
Mike Ingersoll, NCSB No. 52217
Womble Bond Dickinson (US) LLP
301 S. College Street, Ste. 3500
Charlotte, North Carolina  28202
Telephone:  704-331-4992
Facsimile:  704-338-7814
Sean.Perrin@wbd-us.com
Mike.Ingersoll@wbd-us.com

*Counsel for Appellants*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This document complies with type-volume limits because, excluding the parts

of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure

statement, table of contents, table of citations, statement regarding oral

argument, signature block, certificates of counsel, addendum, attachments):

this document contains <u>6,363</u> words.

2.    This document complies with the typeface requirements because:

This document has been prepared in a proportional spaced typeface
using <u>Microsoft Word</u> in <u>14-point Times New Roman</u>.

Respectfully submitted this 6th day of September, 2023.

/s/ Sean F. Perrin
/s/ Mike Ingersoll
Sean Perrin, NCSB No. 22253
Mike Ingersoll, NCSB No. 52217
Womble Bond Dickinson (US) LLP
301 S. College Street, Ste. 3500
Charlotte, North Carolina  28202
Telephone:  704-331-4992
Facsimile:   704-338-7814
Sean.Perrin@wbd-us.com
Mike.Ingersoll@wbd-us.com

*Counsel for Appellants*
